UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20172-KMW

UNITED STATES OF AMERICA,

v.

SHANE HAMPTON,

    Defendant.

_____/

DEFENDANT SHANE HAMPTON'S MOTIONS *IN LIMINE*

Pursuant to the Federal Rules of Evidence and this Court's Order Setting Final Pretrial Conference and Pretrial Deadlines [ECF No. 65], Defendant Shane Hampton files these motions *in limine* to preclude certain arguments, exclude evidence without proper foundation, and admit certain evidence.

## BACKGROUND

On April 20, 2023, a Grand Jury in the Southern District of Forida returned a four-count indictment charging Mr. Hampton with conspiracy to commit securities price manipulation, conspiracy to commit wire fraud, and wire fraud (See D.E. 3 (the "Indictment")). Mr. Hampton was the Head of Financial Engineering at Hydrogen Technology Corporation ("Hydrogen Technology"), a fintech company whose predecessor, Hedgeable, had hired Mr. Hampton straight out of college. Mr. Hampton worked as an engineer, primarily working to write the code behind the financial products that were sold to Hydrogen's customers.

The charges arise out of Hydrogen Technology's efforts in early 2018 to create a utility token, HYDRO, which would operate on the public, open-source blockchain. The endeavor was dubbed Project Hydro and a series of protocols with different functions were given water-related names such as "Ice" or "Raindrop," as part of the branding. Mr. Hampton, as the primary

blockchain engineer at the company, spent hours writing the computer code behind these protocols. An important goal of the project was to get HYDRO into the hands of individuals who would use the token to develop their own apps on top of the blockchain and, hopefully, also incorporate some of the Hydrogen-developed technology. Consistent with Hydrogen Technology's effort to issue HYDRO as a utility token, the company first released HYDRO through an airdrop process, giving away HYDRO for *free* to approximately 10,000 individuals.

Despite numerous efforts to distribute the coin widely, a substantial percentage of the coins remained in the company's repository. Eventually, Hydrogen Technology developed a decentralization plan to distribute the coin. Mr. Hampton understood that the decentralization plan was approved by the company's legal counsel. Mr. Hampton was also advised that Hydrogen Technology and its Board determined that the company would need to hire a firm to assist in executing the decentralization plan. After Mr. Kane directed Mr. Hampton to identify and hire a firm to sell the HYDRO tokens, Mr. Hampton engaged in an extensive process to identify a suitable firm that could sell the HYDRO tokens without collapsing the value of the token.

Hydrogen Technology ultimately hired the firm Moonwalkers to sell the company's store of HYDRO tokens without collapsing the market. The Indictment alleges that Moonwalkers employed a "bot" that Moonwalkers had developed to perform algorithmic trading, and which allegedly engaged in illegal market manipulation.

At trial, Mr. Hampton intends to demonstrate that he never knew of, much less intentionally joined, a conspiracy to commit securities or wire fraud or that he engaged in wire fraud. To that end, Mr. Hampton respectfully submits the below motions *in limine* to ensure that he is permitted to fully present his defense and to preclude the admission of evidence that is irrelevant, unfairly prejudicial, and poses a substantial risk of confusing or misleading the jury.

## **ARGUMENT**

**I.    The Government and its Witnesses Should be Prohibited from Arguing or Insinuating that the Mere Hiring of a Market Maker is an Illegal or Wrongful Act**

The Indictment alleges that Hydrogen Technology and Mr. Hampton hired Moonwalkers to engage in market manipulation for the purpose of deceiving investors and enriching themselves. The Hydrogen Technology contract with Moonwalkers, however, provided that the services of Moonwalkers would entail selling a portion of the HYDRO coins while "devaluing the price of the coin as little as possible" and would include market making. In assessing Mr. Hampton's knowledge and intent to engage in the purported market manipulation scheme, therefore, it will be important for the jury to understand that market makers are accepted and legitimate players within markets and that the mere hiring or use of a market maker is not illegal.

The U.S. Securities and Exchange Commission ("SEC") acknowledges the existence and appropriateness of market makers, defining a "market maker" as

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3–1(c)(8) (2006).

In general, "Market Makers are investors who are members of an exchange. They undertake certain responsibilities, such as agreeing to "create liquidity by being continuously willing to buy and sell the security in which they are making a market." *Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 225 (E.D. Pa. 2016), aff'd, 712 F. App'x 188 (3d Cir. 2017). "In this way, an individual who wishes to buy or sell a security does not have to wait until someone is found who wishes to take the opposite side in the desired transaction. To account for the effort and risk required to maintain liquidity, market makers are allowed to set the prices at which they are

prepared to buy and sell a particular security; the difference between the listed 'ask' and 'bid' prices is the "spread" that market makers capture as compensation." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 268 (3d Cir. 1998). Market makers serve a valuable role in exchanges by "promot[ing] the efficiency of a security's market because they 'react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'" *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 206 (2d Cir. 2008) (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989)).

Because market makers are welcomed market participants, providing necessary liquidity for both the purchase and sale sides of a transaction, the Government and its witnesses should be prohibited from arguing or insinuating to the jury that the mere fact that Hydrogen Technology, Inc. ("Hydrogen") or any of its employees sought and hired a market maker was, by itself, an illegal or wrongful act.

## II. The Government and Its Witnesses Should Be Prohibited from Arguing or Insinuating that the Mere Use of a Bot, Automated Trading Program, or Algorithmic Trading on a Cryptocurrency Exchange Is Illegal or Wrongful

Congress has passed no law and the SEC has passed no rule that prohibits the use of a bot, automated trading program, or other algorithmic trading. *See generally* Gina-Gail S. Fletcher, *Deterring Algorithmic Manipulation*, 74 Vand. L. Rev. 259, (2021) (describing the prevalence of bots across markets and explaining how the SEC regulates bots through other, manipulation-based proscriptions). In a 2020 staff report generated by the SEC, the SEC defined an algorithm as "a finite, deterministic, and effective problem-solving method suitable for implementation as a computer program." SEC Staff Report on Algorithmic Trading in U.S. Capital Markets at 5-6 (August 5, 2020), https://www.sec.gov/files/Algo_Trading_Report_2020.pdf [https://perma.cc/

VXG4-G6P5]. The report further acknowledges that "[t]he use of algorithms in trading is pervasive in today's markets." *Id.* at 5. Indeed, some studies have indicated that algorithmic trading now comprises nearly three fourths of overall trading volume. *See* Michael Mackenzie, *High Frequency Trading under Scrutiny*, Fin. Times, (July 28, 2009), http://www.ft.com/intl/cms/s/0/d5fa0660-7b95-1lde-9772-00144feabdcO.html #axzz3kPGSbBkJ[http://perma.cc/RV5A-LMHT] (showing that 73% of volume in stock markets is attributable to high frequency (algorithmic) trading).

Both the SEC and the legal community recognize that the use of automated trading is commonplace and appropriate provided it abides by the same rules and regulations that constrain human traders. Thus, the Government and its witnesses should be prohibited from arguing or insinuating that the mere fact that Hydrogen and its employees engaged a market maker that employed a bot as part of its trading methods was wrongful or illegal.

### III. The Government May Not Rely on Federal Rule of Evidence 801(d)(2)(E) to Introduce the Out-of-Court Statements of any Purported Co-conspirator that Were Not Made Between the Dates of June 1, 2018 and April 9, 2019

Federal Rule of Evidence 801(d)(2)(E) provides that an out-of-court statement is not hearsay if the statement is offered against an opposing party and "was made by the party's co-conspirator during and in furtherance of the conspiracy." Federal Rule of Evidence 801(d)(2)(E)

The Indictment alleges that Mr. Hampton entered into a conspiracy in or around June 2018 that continued through in or around April 2019. Based on the Government's theory, however, the purported conspiracy ended on April 9, 2019 when Moonwalkers was no longer contracted to work with Hydrogen. Thus, based on the allegations in the indictment and the discovery in this case, the Government should be precluded from relying on the co-conspirator exception to the hearsay rule to introduce any statements made prior to June 1, 2018 and following April 9, 2019. *See United States v. Garcia*, 13 F.3d 1464, 1473 (11th Cir. 1994) (holding that the trial court's objected-to

admission of a co-conspirator statement that pre-dated the conspiracy was "clearly erroneous"); *United States v. Tombrello*, 666 F.2d 485, 490 (11th Cir. 1982) ("It is for this reason that co-conspirators' hearsay statements made after the termination of the conspiracy are not admissible, *e.g., United States v. Postal*, 589 F.2d 862 (5th Cir.), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979), and the same rationale dictates that co-conspirators' statements made before the inception of the conspiracy do not fall within [Federal Rule of Evidence 801(2)(d)(E)'s] exception to the hearsay rule.").

**IV.    The Government May Not Rely on Federal Rule of Evidence 801(d)(2)(E) to Introduce the Out-of-Court Statements of Mr. Hampton's Purported Co-conspirators Without First Establishing that: (1) Mr. Hampton Agreed to Join the Conspiracy; and (2) the Statement Was Made in Furtherance of the Conspiracy**

"Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). To satisfy the court that the statements are admissible under Rule 801(d)(2)(E), the Government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002).

Here, Mr. Hampton requests that before the Government seek to introduce any out-of-court statements by purported co-conspirators, it be required to present to the Court sufficient evidence to establish that Mr. Hampton joined the alleged conspiracy. *Bourjaily*, 483 U.S. at 175 (finding that when the party opposing the introduction of the co-conspirator statement objects, the court must first determine whether the government can establish by the preponderance of the evidence that the exception applies before permitting the introduction of the statement). The Court is

permitted to engage in this inquiry either during trial or pre-trial in a *James* hearing. *See United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917 (1979); *see also United States v. Pepe,* 747 F.2d 632, 652 (11th Cir. 1984).

The Eleventh Circuit is not hesitant to affirm trial court decisions declaring co-conspirator statements inadmissible when the evidence is insufficient to establish that a criminal defendant joined a conspiracy. The Eleventh Circuit's analysis in *United States v. Bulman*, 667 F.2d 1374, 1379 (11th Cir. 1982), affirming the trial court's ruling that the evidence was insufficient to establish that the defendant joined the conspiracy, is illustrative. In *Bulman*, the Eleventh Circuit agreed with the trial court's determination that evidence of the defendant's presence at meetings where illicit activity was discussed, traveling with other defendants, and picking defendants up from the airport showed merely that Bulman knew of the conspiracy, not that he joined in it. *Id.*

Similarly, the Government should be prohibited from introducing statements by Mr. Hampton's alleged co-conspirators under Federal Rule of Evidence 801(d)(2)(E) without the Government first establishing by a preponderance of the evidence that Mr. Hampton was a member of the conspiracy. Mr. Hampton requests that such proof be presented prior to trial at a *James* hearing to prevent the possibility of the jury hearing inadmissible testimony.

**V.     The Government May Not Introduce Any Evidence of Loss Purportedly Caused by the Crimes Alleged in the Indictment**

Loss is not an element of the Government's market manipulation counts or the Government's wire fraud counts and evidence regarding any purported losses caused by the alleged conduct of Mr. Hampton or his alleged co-conspirators has no place at trial. *See* 15 U.S.C. §§ 78i(a)(1)-(2) (no loss requirement); 18 U.S.C. § 1343 (no loss requirement)

Count One of the Indictment charges Mr. Hampton with conspiracy to commit offenses against the United States, specifically securities fraud, in violation of Title 18, U.S.C., § 371 and Title 15,

U.S.C., §§ 78i(a)(1) and (a)(2). Count Two charges Mr. Hampton with conspiracy to commit wire fraud in violation of Title 18, U.S.C. §1349. And Counts Three and Four charge Mr. Hampton with substantive wire fraud in violation of Title 18, U.S.C. §§1343 and (2)(a).

To convict a defendant of market manipulation, the government must prove beyond a reasonable doubt that: (1) a defendant used a means or instrumentality of interstate commerce to effect a transaction in a security; (2) the transaction involved no change of beneficial ownership, or entered an order or orders for the purchase, or sale, of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price has been or will be entered by or for the same or different parties; (3) for the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security. *See* 15 U.S.C. §§ 78i(a)(1); *United States v. Shindler*, 13 F.R.D. 292, 293 (S.D.N.Y. 1952) (interpreting the elements of a prior version of 15 U.S.C. §§ 78i(a)(1)). To show a violation of 15 U.S.C. §§ 78i(a)(2), the government must prove: (1) a series of transactions in a security; (2) creating actual or apparent active trading or raising or depressing the price of such security; (3) for the purpose of inducing others to purchase or sell such security. *See* 15 U.S.C. §§ 78i(a)(2); *United States v. Gilbert*, No. S80 CR. 493-CSH, 1981 WL 1662, at *2 (S.D.N.Y. July 23, 1981), aff'd, 668 F.2d 94 (2d Cir. 1981) (noting that a key distinction between a prior version of 15 U.S.C. §§ 78i(a)(1) and (2) is the requirement of a course of conduct for 15 U.S.C. § 78i(a)(2)). Loss *is not an element* of either offense. *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) ("To prevail on a claim of market manipulation under § 10(b) and Rule 10b–5, the SEC must demonstrate that the defendant engaged in manipulative acts with scienter in connection with the purchase or sale of securities on any facility of a national securities

exchange."); *see also SEC v. Boock*, 09cv8261 (DLC), 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002).

In a criminal prosecution for market manipulation, the Second Circuit explicitly held that it was error to allow testimony concerning losses sustained in trading the stock at issue. *See United States v. Minuse*, 142 F.2d 388, 390 (2d Cir. 1944), cert. denied, 323 U.S. 716 (1944) ("Whether the appellants' manipulative practices caused profit or loss to anyone trading in [the manipulated] stock was irrelevant to the crime with which they were charged. Therefore, it was wholly unwarranted to bring in testimony of losses; such testimony could only confuse the issues and might unfairly influence the jury.").

Similarly, loss is not an element of a wire fraud. *See United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005) (proof of loss is not an element of wire fraud). As summarized by the Eleventh Circuit:

> The mail and wire fraud statutes do not focus on the victim's actual loss but on the defendant's intent to obtain money or property by means of fraud or deceit. As this Court has noted, "financial loss is not at the core" of the mail and wire fraud statutes; "[i]nstead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." [*United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009).] The formulation and implementation of a scheme to defraud support a prosecutable offense regardless of its ultimate success or actual impact on the victim. *See United States v. Suba*, 132 F.3d 662, 673 (11th Cir.1998) (explaining that prosecutable mail fraud does not depend on the success of the scheme); *United States v. Ross*, 131 F.3d 970, 986 (11th Cir. 1997).

*United States v. Artuso*, 482 F. App'x 398, 402–03 (11th Cir. 2012).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Both the market manipulation statutes and the wire fraud statute make clear that the focus is on the criminal defendant's intent to defraud and it is

irrelevant whether the defendant caused losses through the fraud. Where evidence has the capacity "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," it should be excluded as "unfair[ly] prejudic[ial]." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see* Fed. R. Evid. 403. The court's primary goal, after all, is to promote accurate fact-finding, and if the admission of evidence would substantially impede that goal by "distract[ing] the jury from the issues in the case ... [or] arous[ing] the jury's passions to a point where they would act irrationally in reaching a verdict," then the court should not admit the evidence. *United States v. Monsalvatge*, 850 F.3d 483, 495 (2d Cir. 2017).

Here, whether the fraud was successful or not is irrelevant—the evidence of loss fails to assist in any way with either proving or disproving the elements necessary to the charged offenses. The only purpose evidence of loss would serve would be to appeal to the sympathy of the jury in an attempt to entice the jury into finding Mr. Hampton guilty based on the fact that market participants may have lost money. Therefore, the Court should not allow the Government to present evidence of loss at trial.

**VI.   Mr. Hampton May Introduce Evidence that He Relied on Representations that Hydrogen Technology Received Input from Legal Counsel Regarding Its Decentralization Plan and the Hiring of a Market Maker**

To obtain a conviction, the Government must establish beyond a reasonable doubt that Mr. Hampton had the requisite criminal intent to engage in the alleged misconduct. Among the key pieces of evidence the defense will present to demonstrate Mr. Hampton's state of mind is evidence that Mr. Hampton was repeatedly told, by his direct supervisor and others, that Hydrogen Technology obtained the input of legal counsel approving the decentralization plan developed by Hydrogen Technology and the hiring of a market maker. Such evidence is critical to the jury's

assessment of Mr. Hampton's state of mind in his interactions and dealings with Moonwalkers and his alleged co-conspirators during the alleged period of the conspiracy.

To be clear, the evidence that Mr. Hampton was advised by others that counsel had approved the Hydrogen Technology decentralization plan and the hiring of a market maker is not being offered as an advice of counsel defense or for the truth of the matter asserted. A good faith reliance on counsel's advice is an affirmative defense with distinct elements that a defendant must show and which Mr. Hampton is not attempting to prove. *See United States v. Vernon*, 723 F.3d 1234, 1269 (11th Cir. 2013) (listing the elements of the affirmative defense of reliance on the advice of counsel and stating that the defendant bears the burden of proof on the issue). At trial, Mr. Hampton would not try to demonstrate that he provided legal counsel with all of the relevant facts and that he directly relied on legal counsel's advice. Rather, the defense would submit evidence that in making certain decision and taking certain actions Mr. Hampton relied on his belief and understanding that legal counsel had approved of the decentralization plan and the hiring of a market maker. The evidence would be admissible even if Mr. Kane and Hydrogen Technology had never consulted with an attorney at all. *See* Memorandum Opinion and Order, *United States v. Hagen*, 19-cr-0146, ECF No. 206, pg. 5 (*"*To the extent, however, the [defendants] will attempt to make out a good-faith defense—or otherwise support their case—with legal advice received by [co-conspirator] and [co-conspirator]'s subsequent assurances to the [defendants] that their conduct was above-board, the Court will permit them to do so. The Court finds that this derivative advice of counsel does not constitute a true advice-of-counsel defense."). *See also United States v. Hagen*, 60 F.4th 932, 941, 946 (5th Cir. 2023) (holding that there was no error in excluding the testimony of one of the co-conspirator's attorneys in part because it was duplicative of the co-conspirator's own testimony that the contracts had been vetted by law firms and that this fact was

relayed to the defendants.); *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) ("[R]eview of the record makes clear that [defendant]'s good faith defense was not based on advice of counsel, but rather on a simple lack of knowledge of the wrongdoing and absence of intent to participate in it."); *United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) ("The district court apparently equated White's denial of criminal intent with a reliance-on-advice-of-counsel defense, which would have waived the privilege. Reliance on advice of counsel is an affirmative defense, an assertion more positive and specific than a general denial of criminal intent.")

In sum, evidence that Mr. Kane and others represented to Mr. Hampton that the decentralization plan and the hiring of a market maker was vetted by legal counsel should be admitted because it is not an advice of counsel defense and is relevant to the jury's consideration of Mr. Hampton's *mens rea*.

## VII. The Government Should be Prohibited from Introducing Evidence Related to Hydro Labs

The Government should be prohibited from introducing at trial evidence pertaining to Hydro Labs, a distinct entity from Hydrogen Corporation, because such evidence is not probative of any element of the charges against Mr. Hampton and its prejudicial value substantially outweighs any probative value that such evidence might have.

Hydro Labs is a Cayman company founded in April 2019 that has its own Board of Directors and Articles of Association. As part of Hydrogen Technology's decentralization plan, which envisioned putting HYDRO tokens into the hands of developers, Hydrogen transferred a substantial number of HYDRO coins, at no cost, to Hydro Labs. Hydro Labs subsequently began trading HYDRO tokens on an Exchange. On October 20, 2019, Hydro Labs entered into a contract with Moonwalkers for market making services.

The Government has indicated that it intends to introduce evidence that Mr. Hampton advised Mr. Ostern that he would recommend Moonwalkers to Hydro Labs and that Hydro Labs entered into a contract with Moonwalkers. The evidence, however, is of no relevance to Mr. Hampton's culpability. Critically, any evidence pertaining to Hydro labs relates to a time *well-after* the alleged conspiracy and substantive offenses. Mr. Hampton's recommendation of Moonwalkers to Hydro Labs and any related comments about the recommendation, for instance, would have taken place in or around August 2019, substantially outside of the conspiracy period. Similarly, evidence pertaining to the existence of a contract between Hydro Labs and Moonwalkers in or around October 2019 is outside of the conspiracy period.

Moreover, if allowed, any limited probative value the Hydro Labs evidence offers is substantially outweighed by the danger that it will confuse the jury and substantially prejudice Mr. Hampton. Hydro Labs and HYDRO bear similar names and individuals associated with Hydro Labs openly discussed market manipulation strategies with Moonwalkers in a Slack channel chat between Hydro Labs and Moonwalkers. Should the Government be permitted to introduce evidence pertaining to Mr. Hampton's recommendation of Hydro Labs, the hiring of Moonwalkers by Hydro Labs and misconduct by Moonwalkers and Hydro Labs there is a substantial risk that a jury would confuse Hydro Labs for HYDRO, potentially resulting in severe prejudice to Mr. Hampton.

The risk of these two entities being confused is more than theoretical. Mr. Ostern, a key government cooperator and Moonwalkers employee, repeatedly confused the entities himself during his deposition by the Securities and Exchange Commission on September 1, 2021:

Q. Do you know where Hydrogen is based?

A. They told me the Cayman Islands.

> Q. You're talking about Hydrogen or Hydrogen Technology Corporation? It's a Hydro, I understand it that later you dealt with Hydro Labs or Project Hydro, but initially you, your client was the Hydrogen Technology Corporation?
>
> A. Yes, one, one was a foundation set up afterward there was the ?- and it, it seemed like it was really all the people from the other one. Were they in New York I, I think one was based in New York and one was based in Cayman Islands. I apologize; I don't know which one you're referring to.
>
> …
>
> Q. Do you recall who was your point of contact at Hydrogen?
>
> A. It was, I know there is a Robert Kodra and I think he's the one who signed the initial contract. There was a Mark Anstead at Anstead. There was a, I, I, it was a group of them.
>
> Q. Okay, so I think that Robert Kodra and Mark Anstead were affiliated with, you know, Hydro Labs or Project Hydro.
>
> …
>
> Q. So, I'm going to run, I think you mentioned a few names earlier. I just want to make sure that the individuals that are affiliated with Hydro Labs. You mentioned Mark Anstead, is he affiliated with Hydro Labs
>
> A Yeah, I, I don't know if it was Hydro or Hydro Labs. I'm going to get all of those guys mixed up, it was all the same thing.

DOJ-PROD-0000004444 at 0094-95, 0126-27. The fact that an individual who interacted with both entities cannot keep them separate is a stark illustration of the risk of confusion and unfair prejudice that could be created if the Government were permitted to introduce evidence pertaining to Hydro Labs.

Because evidence pertaining to Hydro Labs is irrelevant and because any probative value the evidence might have would be substantially outweighed by its danger of unfairly prejudicing the Mr. Hampton, confusing the issues, and misleading the jury, it should be excluded under Federal Rules of Evidence 401 and 403.

**Certification of Good-Faith Conference;**
**Unable to Resolve All Issues Presented in the Motion**

As required by Local Rule 7.1(a)(3), the undersigned certifies that counsel for Mr. Hampton has conferred with Assistant U.S. Attorney Andrew Jaco in a good-faith effort to resolve the issues raised herein. The Government takes the following position as to Mr. Hampton's Motions: (I) No objection; (II) No objection; (III) Does not object that the conspiracy period is June 1, 2018 through April 9, 2018 and agrees that the Government will not attempt to introduce statements under the co-conspirator exception which post-date April 9, 2018, but objects to being prohibited from relying on this exception as to statements that pre date June 1, 2018; (IV) Does not object to the Government being required to meet the elements by a preponderance of the evidence, but objects to a pretrial hearing; (V) Objects; (VI) Objects; and (VII) Objects.

Dated:  December 7, 2023               Respectfully Submitted,

                                       */s/ Barbara R. Llanes*
                                       BARBARA LLANES
                                       Florida Bar No. 1032727
                                       bllanes@gsgpa.com
                                       CHRISTOPHER S. SUNDBY
                                       Fla Bar No. 1026060
                                       csundby@gsgpa.com
                                       GELBER SCHACHTER & GREENBERG, P.A.
                                       One Southeast Third Avenue, Suite 2600
                                       Miami, Florida 33131
                                       Telephone: (305) 728-0950
                                       E-service: efilings@gsgpa.com

                                       *Counsel for Defendant Shane Hampton*